Vanessa Soriano Power, Mont. Bar No. 7286
Jason T. Morgan, Wash. Bar No. 38346 (*pro hac vice*)
Ryan P. Steen, Wash. Bar No. 39922 (*pro hac vice*)
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, Washington  98101
(206) 624-0900 (phone)
(206) 386-7500 (facsimile)
vanessa.power@stoel.com
jason.morgan@stoel.com
ryan.steen@stoel.com

*Attorneys for Amici Curiae Washington State Snowmobile Association and American Petroleum Institute*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, et al.,<br><br>       Plaintiffs,<br><br>   v.<br><br>U.S. DEPARTMENT OF THE INTERIOR, et al.,<br><br>       Defendants,<br><br>  and<br><br>ALLIANCE  FOR THE WILD ROCKIES, et al.,<br><br>       Plaintiffs,<br><br>   v.<br><br>MICHAEL BEAN, et al.,<br><br>       Defendants. | Civil No. 9:14-cv-00270-DLC<br><br>(consolidated with 9:14-cv-00272-DLC)<br><br><br>**BRIEF OF *AMICI CURIAE* WASHINGTON STATE SNOWMOBILE ASSOCIATION AND AMERICAN PETROLEUM INSTITUTE** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................1

II.    ARGUMENT ...................................................................................3

    A.    Plaintiffs' Expansive View of Critical Habitat Is Directly Contrary to the Plain Language and Legislative History of the ESA ...............................................................................................3

        1.    The ESA Was Amended in 1978 to Narrow the Definition of Critical Habitat ......................................3

        2.    The Plain Language of the ESA Reflects Congressional Intent to Narrow Critical Habitat .................................7

        3.    Plaintiffs' Arguments for Inclusion of Additional Areas Are in Direct Conflict with the Narrow Definition of Critical Habitat .......................................................10

            a.    Plaintiffs' Climate Change Arguments Cannot Be Reconciled with the ESA ...............................10

            b.    The FWS Appropriately Declined to Include Migration Corridors in the Critical Habitat Designation ......................................................15

            c.    The FWS  Appropriately Concluded That the Kettle Range Did Not Qualify as Critical Habitat .........16

    B.    Plaintiffs' Attacks on the Adequacy of the Primary Constituent Elements Are Self-Defeating ...........................................19

III.    CONCLUSION .............................................................................22

79877064.4 0040924-00011

TABLE OF AUTHORITIES

**Cases**

*Alaska Oil & Gas Ass'n v. Salazar*,
  916 F. Supp. 2d 974 (D. Alaska (2013) .........................................................9, 10

*Alliance for the Wild Rockies v. Lyder*,
  728 F. Supp. 2d 1126 (D. Mont. 2010) ........................................................passim

*Ariz. Cattle Growers' Ass'n v. Salazar*,
  606 F.3d 1160 (9th Cir. 2010) ................................................................9, 12, 18

*Bear Valley Mut. Water Co. v. Jewell*,
  790 F.3d 977 (9th Cir. 2015) .............................................................10, 13, 18

*Cape Hatteras Access Pres. Alliance v. Dep't of Interior*,
  344 F. Supp. 2d 108 (D.D.C. 2004) .........................................................9, 12, 13

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) .........................................................................................3, 5

*Turtle Island Restoration Network v. U.S. Dep't of State*,
  673 F.3d 914 (9th Cir. 2012) ...............................................................................11

**Statutes**

16 U.S.C. § 1532(5) ...........................................................................................passim

16 U.S.C. § 1533 ......................................................................................................1

16 U.S.C. § 1533(a)(3)(A)(ii) ................................................................................14

16 U.S.C. § 1536 ......................................................................................................5

Pub. L. No. 93-205, § 7, 87 Stat. 884 (1973) ...........................................................3

Pub. L. No. 95-632, 92 Stat. 3751 (1978) ...............................................................5

**Regulations**

50 C.F.R. § 424.12(b)(5) ........................................................................................20

41 Fed. Reg. 13,926, 13,927 (Apr. 1, 1976) ...........................................................4, 8

43 Fed. Reg. 870, 874-75 (Jan. 4, 1978).....................................................................4

**Other Authorities**

Staff of S. Comm. on Environment and Public Works, 97th Cong., *A
    Legislative History of the Endangered Species Act of 1973, as
    Amended in 1976, 1977, 1978, and 1980* (Comm. Print 1982)...................passim

# I.  INTRODUCTION

Pursuant to section 4 of the Endangered Species Act ("ESA"), the U.S. Fish and Wildlife Service ("FWS") issued a final rule designating 38,954 square miles across six states as critical habitat for a distinct population segment of the Canada lynx.  FR 005240.[1]  The Canada lynx is not threatened or endangered in Canada, but the FWS determined in 2000 that the distinct population segment of the Canada lynx in the United States met the criteria for listing as threatened under the ESA.  *Id*.  Subject to certain conditions, the ESA requires the FWS to designate critical habitat for all listed species.

The FWS's critical habitat designation for the lynx consists of occupied high-elevation habitat, mostly contiguous with Canada.  FR 005299 (map showing designations).  The FWS determined that these areas were occupied by Canada lynx at the time of listing, and contained the physical and biological features essential to the conservation of the lynx.  The FWS did not designate any unoccupied areas because it determined that those areas "would not meaningfully address or ameliorate the threat for which the [distinct population segment] was listed and that doing so would not improve the likelihood of recovery" of the lynx.  FR 005256.

---

[1] Citations to the administrative record are provided with the FWS's bates stamps and begin with the prefixes FR, LIT, PI, COR, etc.

Page 1

Two environmental advocacy groups (referred to in this brief collectively as "Plaintiffs," and separately as "Wildearth" and "Alliance") challenge the critical habitat rule.  Plaintiffs' unifying theme is that designation should be much, much bigger.  Wildearth would expand the designation to include every area within the lynx's "range," including "the mountainous regions of Colorado, south-central Wyoming, and north-central New Mexico," Washington's Kettle Range, northeastern Oregon, Oregon's Cascade Mountains, and Oregon's Blue Mountains. *See* Dkt. 32 ("Wildearth Brief").  Alliance would further expand the designation to include several additional National Forests in Montana and Idaho, and further contends that the designation should include "unoccupied" habitat to respond to future changes in the climate.  *See* Dkt. 35 ("Alliance Brief").  Collectively, Plaintiffs view critical habitat as encompassing the entire historic range, and even the potential future range, of the Canada lynx.

*Amici Curiae* Washington State Snowmobile Association and the American Petroleum Institute hereby respectfully submit this brief to address Plaintiffs' efforts to dramatically expand critical habitat designations beyond the plain language and intent of the ESA.  As detailed below, Congress amended the ESA in 1978 to narrowly confine critical habitat designations to the specific areas that are essential to species conservation.  Plaintiffs' efforts to expand what is already one

of the largest critical habitat designations even further to include marginal lynx habitat or lands that may (or may not) someday become lynx habitat, run directly contrary to those congressional amendments.

## II.  ARGUMENT

**A.  Plaintiffs' Expansive View of Critical Habitat Is Directly Contrary to the Plain Language and Legislative History of the ESA.**

### 1.  The ESA Was Amended in 1978 to Narrow the Definition of Critical Habitat.

Congress originally enacted the ESA in 1973 in response to a rise in the number and severity of threats to the world's wildlife, with the intent of preserving threatened and endangered species and the habitat on which they depend.  *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 177 (1978).  As originally enacted, section 7 of the ESA prohibited the "destruction or modification of habitat" of threatened or endangered species "determined . . . to be critical."  Pub. L. No. 93-205, § 7, 87 Stat. 884 (1973).  However, the ESA did not otherwise define critical habitat, provide procedures for designating critical habitat, or even expressly require such designation.

In the absence of express guidance from Congress, the FWS took a very expansive view of critical habitat, and proceeded to designate critical habitat on an *ad hoc* basis.  In one early designation for the snail darter, the FWS concluded that "habitat" would "consist of a special environment in which a species lives," and

that "[c]ritical habitat . . . could be the entire habitat or any portion thereof." 41 Fed. Reg. 13,926, 13,927 (Apr. 1, 1976).  The FWS finalized more formal regulations in early January 1978, defining critical habitat broadly as "any air, land, or water area . . . and constituent elements thereof, the loss of which would appreciably decrease the likelihood of the survival and recovery of a listed species . . . ." 43 Fed. Reg. 870, 874-75 (Jan. 4, 1978).  That regulation further explains that "[c]ritical habitat may represent any portion of the present habitat of a listed species and may include additional areas for reasonable population expansion." Id. at 875.  By the middle of 1978, the FWS (along with the Secretary of Commerce) had already designated critical habitat for 32 species, with 56 designations pending and an additional 140 species wait-listed for proposed designations.[2]

The ESA's critical habitat provisions quickly became a matter of controversy when a concerned citizen filed suit against the Tennessee Valley Authority alleging that the construction of the Tellico Dam on the Little Tennessee

---

[2] See Staff of S. Comm. on Environment and Public Works, 97th Cong., A Legislative History of the Endangered Species Act of 1973, as Amended in 1976, 1977, 1978, and 1980 (Comm. Print 1982) at 823 (hereinafter "Legislative History").  Amici Curiae are providing electronic copies of relevant portions of the Legislative History as per the Court's order at Dkt. 3.

Page 4

River would result in the destruction of critical habitat for the snail darter, a small fish living in the vicinity of the dam. *See Tenn. Valley*, 437 U.S. at 156. Although construction was "virtually complete[]," with nearly $100 million already expended on the major infrastructure project, the Supreme Court enjoined work on the dam. *Id.* at 172. As the Court explained in its June 15, 1978 opinion, the original language of section 7 and its legislative history appeared to indicate a "plain intent . . . to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

Congress immediately responded to this pronouncement by amending the ESA in November 1978. Pub. L. No. 95-632, 92 Stat. 3751 (1978). As one member of Congress explained, "[t]he Supreme Court decision may be good law, but it is very bad public policy." Legislative History at 822 (reprinting House Consideration and Passage of H.R. 14104, with Amendments). Instead, the FWS needed to be able to consider "commonsense" in implementing the ESA and to better "balance environmental and developmental interest[s] . . . [and] take into consideration more accurately the development needs of this Nation." *Id.* at 801, 837.

The "heart of the problem," as explained by Representative Duncan in proposing changes to the ESA, was the absence of a statutory definition for critical

habitat, and the broad regulatory definition adopted by the FWS.  *Id*. at 880.  The FWS's broad regulatory definition "failed miserably" to address the problems associated with critical habitat (*id*.), and as a result, the FWS's designations were going "too far in just designating territory as far as the eyes can see and the mind can conceive."  *Id*. at 817.  What was needed, instead, was "a showing that [habitat] is essential to the conservation of the species."  *Id*. at 880.  Members of Congress also raised particular concerns about the implications of critical habitat designations "when extremely large land areas are involved" and expressed a need to ensure that a listed species' "true critical habitat" was protected.  *Id*. at 948 (reprinting S. Rep. No. 95-874 (1978)) (referring to the FWS's proposal to designate over 15,000 square miles as grizzly bear critical habitat).

Congress proposed to address these concerns by defining "critical habitat" to "narrow[] the scope of the term."  *Id*. at 749 (reprinting H.R. Rep. No. 95-1625 (1978)).  As proposed by Representative Duncan, the definition of critical habitat would include only "the specific areas within the geographic area[s] occupied by the species on which are found those physical or biological features which are essential to the conservation of the species and which require special management."  *Id*. at 880 (reprinting House Consideration and Passage of H.R.

Page 6

14104, with Amendments).[3]   The result of Representative Duncan's amendments, as incorporated in the conference bill, was an "extremely narrow definition of critical habitat." _Id._ at 1220-21 (reprinting Conf. Rep. on S. 2988).

### 2.   The Plain Language of the ESA Reflects Congressional Intent to Narrow Critical Habitat.

The Congressional intent in 1978 to provide an "extremely narrow definition of critical habitat" (_id._ at 1221) is demonstrated in the plain language of the ESA section 3, codified at 16 U.S.C. § 1532(5).   The full definition of critical habitat is as follows:

> (A)  The term "critical habitat" for a threatened or endangered species means—
>
> > (i)  the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

---

[3] Although H.R. 14104 was not enacted, the language from H.R. 14104 was inserted into the enacted bill (S. 2899).  Legislative History at 904 (reprinting House Consideration and Passage of S.2899, With Amendment, In Lieu of H.R. 14104) (passing motion to amend S. 2899 to "insert . . . the provisions of HR. 14104").   The final statute (Pub. L. No. 95-632) included "virtually identical" language to the House bill.  Legislative History at 1220-21 (reprinting Conf. Rep. on S. 2899) ("[T]he  Senate and House bills were not really all that far apart . . . [and] . . . with all frankness the guts of the House Bill have been retained in the conference report . . . [including] . . . [a]n extremely narrow definition of critical habitat virtually identical to the definition passed by the House[.]").

      (ii)  specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

      (B)  Critical habitat may be established for those species now listed as threatened or endangered species for which no critical habitat has heretofore been established as set forth in subparagraph (A) of this paragraph.

      (C)  Except in those circumstances determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species.

16 U.S.C. § 1532(5).

As the above language demonstrates, the definition of critical habitat is narrowly constrained and reflects the intended "very careful analysis of what is actually needed" for the species.  Legislative History at 817.  The definition rejects the FWS's prior position that "critical habitat . . . could be the entire habitat or any portion thereof" (41 Fed. Reg. at 13,927), explaining that critical habitat ordinarily "shall not include the entire geographical area which can be occupied by the . . . species." 16 U.S.C. § 1532(5)(C).

The definition also divides potential habitat into two categories: (i) geographical areas that are "occupied by the species" at the time of listing, and (ii) geographical areas that are not occupied at the time of listing.  16 U.S.C. §

1532(5)(A).  The definition then provides additional conditions on each category.
*Id.*

For areas that are "occupied" at the time of listing, critical habitat is limited to "specific areas . . . on which are found those physical and biological features . . . essential to the conservation of the species and . . . which may require special management considerations or protection."  *Id.*  Courts interpreting this provision have concluded that the definition requires that the FWS "must determine that the area actually contains physical or biological features essential for the conservation of the species."  *Alaska Oil & Gas Ass'n v. Salazar*, 916 F. Supp. 2d 974, 999 (D. Alaska (2013).  The FWS may not "speculate as to the existence of such features," *id.*, or rely on "hope" that the areas  "will develop [physical and biological features] and be subject to designation."  *Cape Hatteras Access Pres. Alliance v. Dep't of Interior*, 344 F. Supp. 2d 108, 122 (D.D.C. 2004).

For unoccupied areas, the area must be "essential for the conservation of the species."  16 U.S.C § 1532(5)(A)(ii).  Courts interpreting this condition have concluded that the statute "impos[es] a more onerous procedure on the designation of unoccupied areas by requiring the Secretary to make a showing that unoccupied areas are essential for the conservation of the species."  *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010); *see also Alaska Oil & Gas*

*Ass'n,* 916 F. Supp. 2d at 988 ("Designation of unoccupied areas requires a more

rigorous justification from the Service than does the designation of occupied

areas.").  That is so because the requirement that unoccupied areas be "essential for

the conservation of the species" implicitly requires "that the FWS must show that

the *occupied* habitat is not adequate for conservation."  *Bear Valley Mut. Water*

*Co. v. Jewell,* 790 F.3d 977, 994 (9th Cir. 2015) (emphasis added).

> **3.      Plaintiffs' Arguments for Inclusion of Additional Areas Are in Direct Conflict with the Narrow Definition of Critical Habitat.**

Despite the fact that the FWS designated 38,954 square miles of critical

habitat for the lynx, Plaintiffs contend that the FWS should have designated (i)

additional, significantly larger areas to account for potential climate change effects

and to provide migration corridors, and (ii) unoccupied areas to ensure the

conservation of the lynx.  As detailed below, each of these arguments fails in light

of the "extremely narrow definition of critical habitat" adopted by Congress.

> **a.      Plaintiffs' Climate Change Arguments Cannot Be Reconciled with the ESA.**

Alliance contends that the FWS should have designated additional

unoccupied higher-elevation areas as critical habitat to account for future potential

climate change.  In support, Alliance points to a study by Patrick Gonzalez

showing that lynx habitat may shift northward and up mountain slopes due to

climate change (LIT 1430) and a  declaration from Dr. Healy Hamilton (previously

submitted in *Alliance for the Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126 (D. Mont. 2010)), stating that designating additional habitat areas provides a "climate refuge" and is one of the "best insurance policies" for a "climate altered future." COR 107-09.

This argument fails on *res judicata* grounds as it was litigated and lost in *Lyder*.  As the Court explained in *Lyder*, Alliance's reliance "on the Gonzalez report is misplaced."  *Lyder*, 728 F. Supp. 2d at 1142.  It would be "illogical" to designate additional areas as critical habitat "on the basis of favorable future snow conditions if the area lacks the other necessary physical and biological features." *Id.*  Moreover, the Gonzalez study actually found the "suitable snow conditions to all but disappear" by 2100, meaning that the area would not be suitable habitat in any event.  *Id.*  As the Court explained, these climate change arguments are "little more than an attempt to force the Service to designate backup habitat in the hope it will someday become useful to the lynx."  *Id.*  This hope is not a proper basis for designating critical habitat, and Alliance's current arguments are foreclosed by *Lyder*.  *See Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 917 (9th Cir. 2012) ("Res judicata, also known as claim preclusion, applies only where there is '(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties.'" (citation omitted)).

Page 11

In any event, the Alliance's proposal to designate additional areas on the basis of future changes in habitat cannot be squared with Congress's narrow definition of critical habitat.  Occupied habitat is limited to only those specific areas "on which are found those physical or biological features . . . essential to the conservation of the species."  16 U.S.C. 1532(5)(A)(i).  Accordingly, even when a specific area *is currently occupied* and being utilized by a species, it cannot qualify as critical habitat unless it actually contains ("are found") the features essential to the conservation of the species.  *See Cape Hatteras,* 344 F. Supp. 2d at 122 ("The Service may not statutorily cast a net over tracts of land with the mere hope that they will develop [physical and biological features] and be subject to designation.").

Alliance effectively concedes that its proposed climate change refuges do not currently have the physical and biological features essential for the conservation of the species, but contends that *unoccupied* habitat need not have such features.  Alliance Brief at 24.  However, unoccupied habitat imposes an even "more onerous procedure" on the FWS  to show that the area itself is "essential for the conservation of the species."  *Ariz. Cattle Growers,* 606 F.3d at 1163.  If the FWS cannot designate currently *occupied* areas on the "mere hope that they will develop [physical and biological features] and be subject to designation," *Cape*

Page 12

*Hatteras,* 344 F. Supp. 2d at 122, then it certainly cannot designate the more

stringent *unoccupied* areas on the prediction that (under certain models) these areas

may support favorable snow conditions in the distant future.

Here the FWS determined that the 38,954 square miles of occupied critical

was sufficient to conserve the lynx.  FR 005271-72.  It therefore did not designate

any unoccupied areas. *Id*.  Nor could not have legally done so, because in order to

designated unoccupied habitat, "the FWS must show that the *occupied* habitat is

not adequate for conservation." *Bear Valley,* 790 F.3d at 994.

In any event, the FWS carefully reviewed the areas identified by Alliance as

potential climate refuges (e.g., the Southern Rockies) and concluded that climate

change would likely make these areas even less suitable for critical habitat.  FR

005252 ("[H]igh-elevation parts of Colorado are among the areas vulnerable to the

loss of potential lynx habitat in the long term.").  As the FWS explains, "the

amount of potential lynx habitat, already considered patchy and relatively isolated,

will likely decrease, becoming even more patchy and isolated and less capable of

supporting lynx populations over time."  FR 005253.  The FWS appropriately

declined to include "habitat in Colorado and other parts of the Southern Rockies"

that "is marginal, naturally fragmented, and disjunct," that "has not been

historically capable of supporting natural resident lynx populations," and that will not be able to so in the future.

Equally important, Congress recognized that information about which areas are essential to the conservation of the species may change over time, and provided a mechanism to adjust designations.  Specifically, the ESA authorizes the FWS to "revise" critical habitat designations "from time-time thereafter as appropriate." 16 U.S.C. § 1533(a)(3)(A)(ii).  Indeed, this is precisely what the FWS proposed to do in this case if and when climate change leads to shifts in lynx critical habitat. FR 005269 ("As climate change scenarios and ecosystem responses become more regionally certain, revisions to critical habitat may be necessary to accommodate shifts in the range of the essential physical and biological features and any corresponding shift in the range of lynx in the contiguous United States.").

The focus of the ESA critical habitat designation is on protecting those areas that are currently essential to the listed species, not setting aside areas simply because those areas are potentially useful to the species under certain climate change models.  *See* Legislative History at 817.  As the FWS explains: [t]he designation of critical habitat does not affect land ownership or establish a refuge, wilderness, reserve, preserve, or other conservation area."  FR 005262.  Alliance's

Page 14

future climate refuges are simply beyond the pale of anything contemplated by the ESA.

**b.      The FWS Appropriately Declined to Include Migration Corridors in the Critical Habitat Designation.**

Alliance also reprises a previously rejected argument by claiming that the FWS should have designated additional travel corridors and habitat linkages. Alliance Brief at 25.  In the prior litigation, the Court rejected Alliance's argument that the FWS should have designated "unoccupied" areas as travel corridors outside of the five critical habitat units, including "non-lynx habitat such as basins, valleys, [and] agricultural lands."  *Lyder,* 728 F. Supp. 2d at 1139 (brackets in original).  As the Court explained, the "record shows lynx are able to maintain connectivity without the presence of specifically set aside corridors so that connectivity is not an issue." *Id.* at 1139-40.

Alliance attempts to avoid the same result by arguing, this time, that these transportation corridors are actually occupied, rather than unoccupied. Alliance Brief at 26-27.  Because these areas are occupied, Alliance contends, the FWS should have applied the occupied standard.  This argument fails for the same reasons stated in *Lyder.*

Regardless of whether critical habitat is occupied or unoccupied, the habitat must be "essential to the conservation of the species."  16 U.S.C. § 1532(5)(A)(i).

Page 15

The "record shows lynx are able to maintain connectivity without the presence of specifically set aside corridors so that connectivity is not an issue." *Lyder,* 728 F. Supp. 2d at 1139-40.  Indeed, the FWS "reasonably found that lynx can disperse across and connect between areas of unsuitable habitat," and that "lynx dispersal is not hampered by human-caused barriers." *Id.* at 1139. Thus, regardless of whether the areas are occupied or unoccupied, they do not qualify as critical habitat.  FR 005257 ("[T]here is no evidence that human-caused factors have significantly reduced the ability of lynx to disperse or resulted in the loss of genetic or demographic interchange.").

> **c.    The FWS  Appropriately Concluded That the Kettle Range Did Not Qualify as Critical Habitat.**

Wildearth attempts to resurrect an issue abandoned by Alliance in *Lyder* by arguing that the Kettle Range in Northeastern Washington should be included in the critical habitat designation.  In *Lyder*, Alliance argued in its complaint that the Kettle Range was "occupied" but that the FWS inappropriately treated it as unoccupied.  *See* Case No. 9:09-cv-00073-DWM, Dkt. 1 ¶ 80.  This argument was not sufficiently meritorious for Alliance to brief on summary judgment in *Lyder*, and the Court never addressed the issue.  Tellingly, Alliance has dropped the issue entirely in its challenge to the present critical habitat designation.

Wildearth nonetheless proceeds to reprise these arguments (although none of its members appear to have made specific comments on the issue during the rulemaking), claiming that the Kettle Range is occupied habitat, contains the essential physical and biological features, and should be included in the designation.  Wildearth Brief at 16.  Wildearth claims that there is evidence that these areas are occupied, and cites to comments from Dr. Keith Aubry and Gary Koehler, and a letter from the Washington Department of Fish and Wildlife, all of which recommended designating the Kettle Range as critical habitat.  Wildearth Brief at 17, 20.

Wildearth's reliance on these statements is misplaced for a number of reasons.  First, Wildearth neglects to mention that the comments of Aubry, Koehler, and the Washington Department of Fish and Wildlife were filed on prior iterations of the rule (in 2006 and 2008).  FR 18777, 18780, 18785.  As for the current version of the rule, the Washington Department of Fish and Wildlife submitted comments in 2014 expressly *agreeing* that the Kettle Range was *not* occupied at the time of listing, and instead encouraging the FWS to consider whether to designate the areas as unoccupied habitat that is essential to the conservation of the species.  PI 002683.  The FWS declined to do so because "we could not designate the Kettle/Wedge area as critical habitat unless we determine

Page 17

that the [distinct population segment] could only be conserved and recovered if we were to do so." FR 5255. This is entirely consistent with the express requirements of the ESA for unoccupied critical habitat, which can only be designated after finding "that the *occupied* habitat is not adequate for conservation." *Bear Valley,* *790 F.3d at 994* (emphasis added).

Moreover, a review of the prior statements of Aubry and Koehler only supports the FWS's current decision to not designate the Kettle Range as critical habitat. Aubry explains that lynx in the Kettle Range were "extirpated" due to "habitat loss or degradation" and that "I know of no evidence of lynx reproduction in the Kettle Range during the last 10 years." FR 18777. Koehler similarly agrees that lynx have been extirpated from the Kettle Range (but identifies trapping as the reason) and explains that "the probability of lynx recolonizing the Kettle Range from British Columbia may be low." FR 18785. These statements provide no reason to believe the Kettle Range was occupied when the lynx was listed as threatened in 2000.

At bottom, Wildearth would treat any area where lynx tracks may be found as "occupied" under the definition of critical habitat. However, "[w]hether a species occupies an area under the ESA 'is a highly contextual and fact-dependent inquiry.'" *Lyder,* 728 F. Supp. 2d at 1130 (citation omitted); *Ariz. Cattle Growers,*

Page 18

606 F.3d at 1164 ("[T]he word 'occupied,' standing alone, does not provide a clear standard for how frequently a species must use an area before the agency can designate it as critical habitat."). The FWS was not required by the ESA to determine that the Kettle Range was "occupied" where the evidence shows that the population had been extirpated, that there was no evidence of reproducing populations in the area, and that the probability of recolonizing the Kettle Range would be "low."

Although Wildearth might prefer to broadly designate areas as critical habitat based on their potential for future use, Congress was express that "critical habitat shall not include the entire geographical area *which can be occupied* by the threatened or endangered species." 16 U.S.C. § 1532(5)(C) (emphasis added). As was the case in *Lyder*, Wildearth's arguments fail because the ESA does not authorize the FWS "to designate backup habitat in the hope that it will someday become useful to the lynx." *Lyder*, 728 F. Supp. 2d at 1142-43.

**B.     Plaintiffs' Attacks on the Adequacy of the Primary Constituent Elements Are Self-Defeating.**

Lastly, Plaintiffs challenge the FWS's definition of the lynx's "primary constituent element" as arbitrary. Pursuant to its joint regulations with the Secretary of Commerce, the FWS determines the "physical and biological features" enumerated in 16 U.S.C. 1532(5)(A)(i) by defining the "primary

constituent elements" that make up that habitat.  50 C.F.R. § 424.12(b)(5).  These

primary constituent elements include things like cover or shelter, sites for breeding

or reproduction, and habitats that are protected from disturbance.  *Id.*

      In determining the critical habitat for the lynx, the FWS defined a single (but

multi-faceted) primary constituent element as follows:

> (1) Boreal forest landscapes supporting a mosaic of
> differing successional forest stages and containing:
>
>    (a) Presence of snowshoe hares and their preferred
> habitat conditions, which include dense understories of young
> trees, shrubs or overhanging boughs that protrude above the
> snow, and mature multistoried stands with conifer boughs
> touching the snow surface;
>
>    (b) Winter conditions that provide and maintain deep
> fluffy snow for extended periods of time;
>
>    (c) Sites for denning that have abundant coarse woody
> debris, such as downed trees and root wads; and
>
>    (d) Matrix habitat (e.g., hardwood forest, dry forest, non-
> forest, or other habitat types that do not support snowshoe
> hares) that occurs between patches of boreal forest in close
> juxtaposition (at the scale of a lynx home range) such that lynx
> are likely to travel through such habitat while accessing patches
> of boreal forest within a home range.

FR 005269-70.  This is the exact same definition that the FWS used in its previous

designation of lynx critical habitat.

As Plaintiffs explain, the FWS then used this primary constituent element as a "litmus test." Alliance Brief at 22. The FWS included 38,954 square miles of habitat that possessed this primary constituent element in sufficient quantity and spatial arrangement, and excluded areas that did not have sufficient quantity and spatial arrangement. FR 005270 (explaining importance of proper spatial arrangement in identifying critical habitat); FR 005254 ("[H]abitats in the GYA have been demonstrated to contain the essential features in sufficient quantity and spatial arrangement . . . ."); FR 005255 ("[W]hile the Kettle Range contains physical and biological features important to lynx, its spatial configuration and quantity of habitat do not appear to be sufficient to provide for the conservation of lynx."); FR 005256 (areas in Colorado " do not contain the physical and biological features essential to lynx in adequate quantity and/or spatial arrangement to support a lynx population over time").

Wildearth complains that this metric "cannot be defined or measured" and is therefore arbitrary. Wildearth Brief at 22. Alliance similarly argues that this primary constituent element is "too vague to be meaningful." Alliance Brief at 29. Plaintiffs' arguments, if accepted, are self-defeating, as they would require invalidation of the entire critical habitat rule. The same litmus test used to exclude critical habitat was *also used to include all 38,954 square miles of critical habitat*.

*See, e.g.*, FR 005254, 005255 (using same test to include Greater Yellowstone Area and exclude Kettle Range).  If that litmus test is "too vague to be meaningful" as Plaintiffs contend, then the entire rule has no basis.  Plaintiffs cannot have it both ways.

### III.  CONCLUSION

For the reasons articulated herein, *Amici Curiae* respectfully request that the Court deny the Plaintiffs' motions for summary judgment.

DATED:  September 18, 2015

STOEL RIVES LLP

 */s/ Jason T. Morgan*
Jason T. Morgan (*pro hac vice*)
Wash. Bar No. 38346
*Attorneys for Amici Curiae*
*Washington State Snowmobile*
*Association and American Petroleum*
*Institute*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(d), I certify that the attached brief is proportionately

spaced, has a typeface of 14 points or more, and contains 4,839 words of text.

DATED: September 18, 2015

STOEL RIVES LLP

*/s/ Jason T. Morgan*
Jason T. Morgan (*pro hac vice*)
Wash. Bar No. 38346
*Attorneys for Amici Curiae Washington
State Snowmobile Association and
American Petroleum Institute*

79877064.4 0040924-00011

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2015, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the following:

**Matthew Kellogg Bishop**          bishop@westernlaw.org

**Lesley K. Lawrence-Hammer**      Lesley.Lawrence-Hammer@usdoj.gov;
                                    EFILE_WMRS.ENRD@usdoj.gov

**Sarah K. McMillan**               smcmillan@wildearthguardians.org

**John R. Mellgren**                mellgren@westernlaw.org

**Mark Steger Smith**               mark.smith3@usdoj.gov; lori.thorn@usdoj.gov;
                                    charla.hayward@usdoj.gov;
                                    Elle.Whitacre@usdoj.gov;
                                    Susan.D.Hughes@usdoj.gov;
                                    sandy.becker@usdoj.gov;
                                    amy.finnegan@usdoj.gov

      DATED:  September 18, 2015

               STOEL RIVES LLP

               _/s/ Jason T. Morgan_____
               Jason T. Morgan (*pro hac vice*)
               Wash. Bar No. 38346
               jason.morgan@stoel.com
               STOEL RIVES LLP
               600 University Street, Suite 3600
               Seattle, WA  98101
               Telephone:  (206) 624-0900
               Facsimile:  (206) 386-7500

               *Attorneys for Amici Curiae*
               *Washington State Snowmobile Association*
               *and American Petroleum Institute*