IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, a non-profit organization; CONSERVATION NORTHWEST, a non-profit organization; OREGON WILD, a non-profit organization; CASCADIA WILDLANDS, a non-profit organization; and WILDERNESS WORKSHOP, <br><br> Plaintiffs, <br><br> vs. <br><br> U.S. DEPARTMENT OF THE INTERIOR, a federal department; SALLY JEWELL, in her official capacity as Secretary of the Interior; DANIEL ASHE, in his official capacity as Director of the U.S. Fish and Wildlife Service; and U.S. FISH AND WILDLIFE SERVICE, a federal agency, <br><br> Defendants. | CV 14–270–M–DLC <br><br> (Consolidated with Case No. 14–272–M–DLC) <br><br> ORDER |

Before the Court are cross-motions for summary judgment[1] in these

---

[1]Also pending is Defendants' motion to strike extra-record materials appended to Plaintiffs' summary judgment briefs, as well as alleged improper legal arguments included in Plaintiffs' statement of facts. Because the Court's decision in no way relied upon those materials and arguments, the Court will grant Defendants' motion to strike.

consolidated cases challenging the United States Fish & Wildlife Service's (the

"Service") revised designation of critical habitat for the Canada lynx ("lynx"),

published in the Federal Register on September 12, 2014 (the "September 2014

final rule").  (FR-005239[2] et seq.).  The Court held a hearing on the motions on

March 9, 2016.  For the reasons explained below, the Court grants the motions in

part, denies the motions in part, and remands this matter to the Service for further

consideration consistent with this order.

## BACKGROUND

The Service's effort to designate lynx critical habitat in the contiguous

United States has consumed sixteen years and frequently overlapped with the

federal court system.  On March 24, 2000, the Service published a final rule listing

the lynx as a threatened species in fourteen states.  (LIT-012981 et seq.)  However,

due to budgetary concerns, the Service deferred critical habitat designation and

pledged to "develop a proposal to designate critical habitat . . . as soon as feasible,

considering . . . workload priorities."  (LIT-013013.)  When the process

languished, a collection of environmental groups sued the Service in the United

States District Court for the District of Columbia, and obtained a court order

---

[2]The Court will employ the government's method of citing to the administrative record in this case, which consists of a directory code ("FR" for Final Rule Development, "PR" for Proposed Rule Development, etc.) followed by a page number specific to that directory.

directing the Service to publish a final rule designating lynx critical habitat by

November 1, 2006. (LIT-013081.) The Service published the final rule on

November 9, 2006, and with it designated 1,841 square miles over four "units"

nationwide[3]. (LIT-013102.) Less than a year later, faced with "questions . . .

about the integrity of scientific information used and whether the decision made

---

[3]The Service included the following description of the "procedural and resource difficulties" it confronted leading up to the 2006 final rule:

> "We have been inundated with lawsuits for our failure to designate critical habitat, and we face a growing number of lawsuits challenging critical habitat determinations once they are made. These lawsuits have subjected the Service to an ever-increasing series of court orders and court-approved settlement agreements, compliance with which now consumes nearly the entire listing program budget. This leaves the Service with little ability to prioritize its activities to direct scarce listing resources to the listing program actions with the most biologically urgent species conservation needs. The consequence of the critical habitat litigation activity is that limited listing funds are used to defend active lawsuits, to respond to Notices of Intent (NOIs) to sue relative to critical habitat, and to comply with the growing number of adverse court orders. As a result, listing petition responses, the Service's own proposals to list critically imperiled species, and final listing determinations on existing proposals are all significantly delayed. The accelerated schedules of court ordered designations have left the Service with limited ability to provide for public participation or to ensure a defect-free rulemaking process before making decisions on listing and critical habitat proposals, due to the risks associated with noncompliance with judicially imposed deadlines. This in turn fosters a second round of litigation in which those who fear adverse impacts from critical habitat designations challenge those designations. The cycle of litigation appears endless, and is very expensive, thus diverting resources from conservation actions that may provide relatively more benefit to imperiled species.

(LIT-013080–81.)

was consistent with the appropriate legal standards," the Service announced it would revisit its lynx critical habitat designation. (LIT-013187.) The Service published a final rule revising its earlier lynx critical habitat designation on February 25, 2009, this time identifying approximately 39,000 square miles of critical habitat over five units in Maine, Minnesota, Montana, Wyoming, Idaho, and Washington. (LIT-013186.)

Three months later, four environmental groups—including several of the plaintiffs in these two cases—filed suit challenging the Service's designation. This Court granted the plaintiffs' motion for summary judgment in part, and found that the Service ran afoul of the ESA with regard to its treatment of occupied critical habitat. *Alliance for the Wild Rockies v. Lyder*, 726 F. Supp. 2d 1126, 1145 (D. Mont. 2010) [hereinafter, *Lyder*]. Specifically, the Court found that: (1) with respect to Montana and Idaho, the Service impermissibly relied upon a lack of reproductive data to support its conclusion that certain areas did not contain the "primary constituent elements" ("PCE") of lynx critical habitat; and (2) with respect to Colorado, the Service impermissibly concluded that the PCE was not present because the available data did not suggest that the lynx population in Colorado was self-sustaining. *Id*. at 1134, 1137. The Court remanded the February 2009 final rule to the Service for further consideration, but also ordered

that the rule would remain in place until superseded by a revised designation. *Id*. at 1145. The subsequently-revised designation, published September 12, 2014, is the subject of the instant lawsuit.

Plaintiffs in CV 14–270–M–DLC and CV 14–272–M–DLC filed their respective Complaints on November 17, 2014. In their joint case management plans, Plaintiffs asserted that the cases shared common questions sufficient to justify consolidating the two matters, and the Court so ordered under case number CV 14–270–M–DLC on January 12, 2015. The parties stipulated that Plaintiffs in each case would file separate summary judgment briefing, while Defendants would file consolidated briefing. Plaintiffs filed their opening briefs in late July 2015, briefing concluded in December 2015, and the Court held a hearing on the motions on March 9, 2015.

## LEGAL STANDARDS

### I.     Summary Judgment

A party is entitled to summary judgment if it can demonstrate that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over

facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248. "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether [an] agency could reasonably have found the facts as it did" based upon the "evidence in the administrative record." *City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (citations omitted).

## II.    Administrative Procedure Act

Courts review claims regarding the ESA under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. *See Native Ecosystems Council v. Dombeck*, 304 F 3d 886, 891 (9th Cir. 2002). Under the APA, a "reviewing court shall hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court's scope of review is narrow, and the Court should "not substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A decision is arbitrary and capricious:

> only if the agency relied on factors Congress did not
> intend it to consider, entirely failed to consider an
> important aspect of the problem, or offered an

> explanation that runs counter to the evidence before the
> agency or is so implausible that it could not be ascribed
> to a difference in view or the product of agency
> expertise.

*Gardner v. U.S. Bureau of Land Mgmt.,* 638 F3d 1217, 1224 (9th Cir. 2011). An

agency's actions are valid if it "considered the relevant factors and articulated a

rational connection between the facts found and the choices made." *Id.* (internal

quotation marks omitted). If the record supports the agency's decision, that

decision should be upheld even if the record could support alternative findings.

*Arkansas v. Oklahoma*, 503 U.S. 91, 112-113 (1992). Review of the agency's

action is "highly deferential, presuming the agency action to be valid."

*Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010).

However, this presumption does not require courts to "rubber stamp"

administrative decisions "they deem inconsistent with a statutory mandate or that

frustrate the congressional policy underlying a statute." *Bureau of Alcohol,*

*Tobacco & Firearms v. Fed. Labor Relations Auth.*, 464 U.S. 89, 97 (1983)

(internal quotation marks omitted). Judicial review under the APA is "narrow but

searching and careful," and courts need not uphold agency actions where "there

has been a clear error of judgment." *Gifford Pinchot Task Force v. U.S. Fish &*

*Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004) (citations and internal

quotation marks omitted).

**ANALYSIS**

## I.    The ESA

The ESA was enacted to "provide a program for the conservation of . . . endangered species and threatened species" and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).  To receive the full protections of the ESA, a species must first be listed by the Service as "endangered" or "threatened." *Id*. § 1533.  Under the ESA, an "endangered" species "means any species which is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6).  A "threatened" species "means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

Upon listing a species under the ESA, the Service must, "to the maximum extent prudent and determinable," designate critical habitat for such species. *Id*. § 1533(a)(3).  Under the ESA, "critical habitat" means "the specific areas within the geographical area occupied by the species, at the time it is listed . . . , on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or

protection; and . . . specific areas outside the geographical area occupied by the species at the time it is listed . . . , upon a determination by the [Service] that such areas are essential for the conservation of the species." *Id*. § 1532(5)(A). These two varieties of habitat are generally referred to as "occupied" and "unoccupied."

In determining whether occupied habitat constitutes "critical habitat," the Service is directed to "[i]dentify [the] physical and biological features essential to the conservation of the species at an appropriate level of specificity using the best available scientific data." 50 C.F.R. § 424.12(b)(1)(ii) (2016). "This analysis will vary between species and may include consideration of the appropriate quality, quantity, and spatial and temporal arrangements of such features in the context of the life history, status, and conservation needs of the species." *Id*. These "physical or biological features" constitute the primary constituent elements ("PCEs"), and are defined as "[t]he features that support the life-history needs of the species, including but not limited to, water characteristics, soil type, geological features, sites, prey, vegetation, symbiotic species, or other features." *Id*. § 424.02 "A feature may be a single habitat characteristic, or a more complex combination of habitat characteristics," and "may include habitat characteristics that support ephemeral or dynamic habitat conditions." *Id*. Moreover, "[t]he [ESA] contemplates the inclusion of areas that contain PCEs essential for occupation by

the [particular species], even if there is no available evidence documenting current activity." *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 556 (9th Cir. 2016)

As with determinations regarding whether a species is "threatened" or "endangered," the Service is directed to designate critical habitat "on the basis of the best scientific data available." 16 U.S.C. § 1533(b)(2). This requirement reflects the ESA's "concern[] with protecting the future of [a listed] species, not merely the preservation of existing [members of the species]." *Alaska Oil & Gas Ass'n*, 815 F.3d at 555. The Service "may not base its [decisions] on speculation or surmise," but "where there is no superior data, occasional imperfections do not violate the ESA." *Id*. (citing *Bldg. Indus. Ass'n of Super. Cal. v. Norton*, 247 F.3d 1241, 1247 (D.C. Cir. 2001)). "The best available data requirement . . . prohibits [the Service] from disregarding available scientific evidence that is in some way better than the evidence it relies on." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006) (citations and alterations omitted).

## II.     The Lynx PCE

The lynx PCE in the contiguous United States, first developed in the Service's 2009 listing decision and subsequently confirmed in its 2013 proposed listing rule, consists of "[b]oreal forest landscapes supporting a mosaic of differing successional forest stages and containing: (a) [p]resence of snowshoe hares and

their preferred habitat conditions, which include dense understories of young trees, shrubs or overhanging boughs that protrude above the snow, and mature multistoried stands with conifer boughs touching the snow surface; (b) [w]inter conditions that provide and maintain deep fluffy snow for extended periods of time; (c) [s]ites for denning that have abundant coarse woody debris, such as downed trees and root wads; and (d) [m]atrix habitat (e.g., hardwood forest, dry forest, non-forest, or other habitat types that do not support snowshoe hares) that occurs between patches of boreal forest in close juxtaposition (at the scale of a lynx home range) such that lynx are likely to travel through such habitat while accessing patches of boreal forest within a home range." (FR-005269–70.)

## III. Plaintiffs' Motions

In their motions for summary judgment, Plaintiffs focus on particular geographical areas that the Service excluded from its final critical habitat designation, including the Southern Rockies, particularly Colorado; the Kettle Range of northeastern Washington; the state of Oregon; and certain National Forest lands in Montana and Idaho. Plaintiffs in CV 14–272–M–DLC also challenge the Service's decision against designating any unoccupied critical habitat, as well as the elements of the PCE itself. The Court will address each argument in turn, and ultimately agrees with Plaintiffs only with respect to

Colorado and the National Forest lands in Montana and Idaho.

**A.    Colorado**

Plaintiffs contend that the Service's exclusion of Colorado from the September 2014 final rule was erroneous for the following reasons: (1) the Service's decision conflicts with the best available science regarding lynx presence and persistence in Colorado; (2) the Service employed an undefined metric in excluding Colorado; and (3) the Service analyzed Colorado's critical habitat content using criteria not enumerated in the PCE.  The Service counters, as it explained in the final rule, that though the PCE may be present in Colorado to some degree, the area does not contain the individual elements "in the quantity and spatial arrangement necessary to provide for the conservation of the species." (Doc. 44 at 25.)  The government translates this to mean that the PCE is only actually present in a given area when there is enough of it to meet certain thresholds.  Because the final rule at once fails to clearly articulate these thresholds yet appears to suggest they are met in Colorado, the Court will grant Plaintiffs' motion for summary judgment with respect to the Service's treatment of lynx critical habitat in Colorado.

Notwithstanding the parties' various detailed citations to the administrative record on this issue, the Court finds the final rule itself most illuminating.  First, in

the section describing the lynx PCE, the Service stated the following:

> Many places in the contiguous United States have (1) some amount of boreal forest supporting a mosaic of successional stages, (a) snowshoe hares and their habitats, (b) deep, fluffy snow for extended periods, (c) denning habitat, and (d) other habitat types interspersed among boreal forest patches, but which do not and cannot support lynx populations. That is, not all boreal forest landscapes supporting a mosaic of differing successional forest stages contain the physical and biological features essential to lynx in adequate quantities and spatial arrangements on the landscape to support lynx populations over time. Lynx may occasionally (even regularly, if intermittently) occur temporarily in places that do not contain all of the elements of the PCE, especially during "irruptions" of lynx into the northern contiguous United States following hare population crashes in Canada . . . . Other areas may contain all the essential physical and biological features but in quantities and spatial arrangements that are inadequate to support lynx over time. For example, although evidence of lynx reproduction confirms the presence of the essential physical and biological features, short-term, sporadic, or inconsistent reproduction that is inadequate to maintain a population over time (i.e., where reproduction and recruitment are too low to consistently offset mortality and emigration over the long term) suggests that the quantity or spatial arrangement (or both) of one or more of the essential features is inadequate. These areas do not contain the PCE, are likely population "sinks," and as such do not contribute to lynx conservation or recovery.

(FR-005270.) Then, in a section entitled "Criteria Used to Identify Critical

Habitat," the Service stated the following:

> To delineate critical habitat for lynx, [the Service] must
> be able to distinguish across the extensive range of the
> species in the contiguous United States, areas that
> contain all essential physical and biological features in
> adequate quantity and spatial arrangement to support
> lynx populations over time . . . from other areas that may
> contain some or all of the features but in inadequate
> quantities and/or spatial arrangements of one or more
> feature (and which, therefore, by definition do not
> contain the PCE). *However, the scientific literature does
> not confer precisely what quantities and spatial
> arrangements of the physical and biological features are
> needed to support lynx populations throughout the range
> of the DPS.* We lack range-wide site-specific
> information or tools that would allow us to analyze
> boreal forests across much of the range of the DPS and
> determine which specific areas contain the spatial and
> temporal mosaic of habitats and hare densities that lynx
> populations need to persist.

(FR-005272 (emphasis added).) In other words, lynx have different habitat needs

in different parts of the country, regardless of the literal textual uniformity of the

PCE as written by the Service. Finally, in the section applying the habitat criteria

to the Southern Rockies and Colorado, the Service stated the following:

> In 1999, just prior to lynx being listed under the [ESA],
> the Colorado Division of Wildlife (now Colorado Parks
> and Wildlife (CPW)) began an intensive effort to
> establish a lynx population in Colorado, eventually
> releasing 218 wildcaught Alaskan and Canadian lynx
> from 1999 to 2006 . . . . At least 122 (56 percent) of the
> introduced lynx died by June of 2010 . . . , *but others*

*survived and established home ranges in Colorado, produced kittens in some years, and now are distributed throughout forested areas of western Colorado.* Some lynx from this introduced population have also traveled into northern New Mexico, eastern Utah, and southern and western Wyoming, though no reproduction outside of Colorado has been documented by these dispersers.

The CPW has determined the lynx introduction effort to be a success based on attainment of several benchmarks (e.g., high post-release survival, low adult mortality rates, *successful reproduction, recruitment equal to or greater than mortality over time* . . .), but acknowledges that the future persistence of the population is uncertain and hinges on the assumption that patterns of annual reproduction and survival observed as of 2010 repeat themselves during the next 20 or more years . . . . However, CPW has discontinued the intensive monitoring necessary to determine if these patterns of reproduction and survival will persist over that time . . . , instead embarking on a passive monitoring program to detect lynx presence . . . .

Although parts of Colorado and the Southern Rocky Mountains clearly contain some (perhaps all) of the physical and biological features lynx need, available evidence does not indicate that the area, or any parts of it, contain the features in the quantity and spatial arrangement necessary to provide for the conservation of the species. That is, the PCE is the elements of the [physical and biological features] in adequate quantity and spatial arrangement on a landscape scale. Some areas may contain some amounts of all the [physical and biological features], but with one or more in inadequate quantity and/or spatial arrangement and, therefore, does not contain the PCE.

(FR-005274–75 (emphasis added).)  The Service then discussed what appears to be the only feature of the PCE it considered "inadequate" in Colorado—snowshoe hare density.  The Service cited various studies estimating anywhere from 0.004 hares per acre in lodgepole pine stands to 0.5 hares per acre in mature Engelmann spruce-subalpine fir stands in west-central Colorado, to 0.3 hares per acre in Summit County, Colorado.  (FR-005275.)  The Service also cited one study which "concluded that a snowshoe hare density greater than 0.2 hares per [acre] . . . may be necessary for lynx persistence," and another study which "determined that a hare density of 0.4–0.7 hares per [acre] . . . would be needed for persistence of lynx translocated . . . to the southern portion of the [lynx] range."  (*Id*.) Ultimately, the Service concluded that: (1) "[t]he generally low hare densities reported in most cases in what is considered good hare habitat in western Colorado and the very large [lynx] home ranges . . . suggest that even the best potential lynx habitat in the Southern Rocky Mountains is marginal and unlikely to support lynx populations over time"; (2) "the Southern Rocky Mountains likely do not possess the physical and biological features essential to lynx in sufficient quantity and spatial arrangement to sustain lynx populations over time"; and (3) "the habitat in Colorado and elsewhere in the Southern Rocky Mountains does not contain the PCE [and] is not essential for the conservation of the lynx."  (*Id*.)

Plaintiffs essentially contend that the Service added to or otherwise qualified the PCE with respect to Colorado by requiring the elements of the PCE to be present and arranged in undefined ways and for undefined periods of time. They also contend that the best available science, which indicates that the introduced lynx population in Colorado is reproducing, undercuts the Service's conclusion that the PCE is not present in Colorado. The Court agrees on both fronts.

First, the plain language of the PCE leaves no room for the sort of qualifying the Service engaged in here. The Court views the overriding purpose of PCEs, with respect to any listed species, as tools for objectively identifying critical habitat in a binary fashion—the elements of a species' PCE either are or are not present in a particular area. While the ESA's implementing regulations expressly contemplate agency discretion in the *formulation* of a PCE, *see* 50 C.F.R. §§ 424.02, 424.12(b)(1)(ii)[4], that discretion is curtailed when it comes to mapping where the PCE is located. In the case of Colorado, where "most if not all" of the elements of the PCE are "clearly" present, the evidence in the final rule compels the designation of critical habitat in that state. While the Court

---

[4]For these same reasons, the Court rejects Plaintiff's challenge to the PCE, which is clearly an agency decision within the scientific expertise of the Service.

understands the Service's point at oral argument that there must be measurable quantities of the PCE's elements present before the Service can safely conclude that an area in fact contains the PCE, the terms of the PCE itself require only the "presence of snowshoe hares and their preferred habitat." The September 2014 final rule sets out hare density data suggesting that parts of Colorado support hare densities at or near those thought necessary for supporting lynx populations, meaning snowshoe hares are certainly "present." In such a close call on a single element of the PCE, where the Service tacitly acknowledges that all other elements are present, the ESA demands that the tie go to the species. *See Ariz. Cattle Growers Ass'n v. Salazar*, 606 F.3d 1160, 1166–67 (9th Cir. 2010).

Moreover, the ESA's phrasing establishes that the Service's role is to determine which "physical and biological features [are] essential to the conservation of the species," not to determine which *lands* are essential to the conservation of the species. 16 U.S.C. § 1532(5)(A)(i). The latter presents the risk of interposing subjectivity into the task of identifying critical habitat, because the Service could objectively find a species' PCE in a location yet look to extra-PCE factors in determining whether the location held conservation value. This dovetails with the point immediately above—the Service should simply be asking whether an area contains a species' PCE, exactly as enumerated, not weighing

conservation value based on other considerations that may apply in some areas but not in others. Indeed, in this case, the Service looked not only for the presence of the PCE, but an amount of the PCE it decided was necessary to support lynx over some undisclosed amount of time.

Second, by failing to acknowledge that lynx reproduction in Colorado likely signals the presence of the PCE in at least some parts of the state, the Service's contrary conclusion "runs counter to the evidence before the agency" and frustrates the purpose of the ESA. *Gardner*, 638 F3d at 1224. The Court in *Lyder* specifically found, *and agreed with the Service*, that "evidence of breeding populations is the best way to verify that the physical and biological features essential to lynx are present in sufficient quantity and spatial configuration to meet the needs of the species." 728 F. Supp. 2d at 1134. The same holds true for "evidence of a self-sustaining population." *Id*. at 1137. These are eminently logical concepts—no species will breed in the absence of sufficient resources for both parent and offspring, and no population sustains itself, absent immigration, without some level of reproduction. Yet, in the September 2014 final rule, the Service abandoned these ideas when it came to Colorado. Instead, the Service concluded that notwithstanding the successful seventeen-year campaign to reintroduce lynx to Colorado, the state's less-than-ideal hare densities mean not a

-19-

single acre of critical habitat exists there, and that "the lynx population in Colorado is beneficial, but not essential, for recovery." (FR-005275.) Given that evidence cited by the Service in the September 2014 final rule shows that a reproducing lynx population exists in Colorado, the Service's failure, on account of marginal hare densities, to designate critical habitat to protect that population and aid in its maintenance is arbitrary, capricious, and "offends the ESA." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004).

Based on the foregoing, the Court grants Plaintiffs' motions for summary judgment with respect to lynx critical habitat designation in Colorado, and remands the September 2014 final rule to the Service for reconsideration. The Service's own representations suggest that parts of Colorado constitute suitable critical habitat, appropriate for designation.

## B.    The Kettle Range

Plaintiffs in CV 14–270–M–DLC contend that the Service erred by excluding the Kettle Range, a relatively small north-south oriented mountain range in northeastern Washington, from the critical habitat designation at issue. Plaintiffs allege that the Kettle range "contains boreal forest landscapes with sufficient snowshoe hare densities and winter snow, making it ideal for lynx."

(Doc. 32 at 21.)  More importantly, given the Service's determination that the Kettle Range was unoccupied by lynx at the time of listing in 2000, Plaintiffs claim that record evidence shows the Kettle Range was in fact occupied at the time of listing.  The Service counters that the best available science regarding occupancy in this area, which appears relatively scant, simply does not support the conclusion that lynx occupied the Kettle Range in 2000.  Because the Court must defer to the Service's reasonable interpretation of "evidence for and against its decision," *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010), the Court will grant Defendants' motion for summary judgment with respect to the Service's exclusion of the Kettle Range.

The primary record evidence which could support a conclusion that the Kettle Range was occupied by lynx at the time of listing derives from materials submitted by the Washington Department of Fish and Wildlife ("WDFW") to the Service in regards to the 2009 critical habitat designation.  Most notably, in a comment letter to the Service regarding the 2009 proposed rule, WDFW refuted the Service's conclusion that only two lynx detections occurred in the Kettle Range in the 1990's, and instead claimed to have received reports of twenty-six lynx detections between 1990 and 2007.  (FR-018780.)  Also, using suitable habitat and predicted lynx density as proxies, WDFW estimated in its 2001 Lynx

Recovery Plan that the Kettle Range hosted an estimated twelve lynx, though the margin of error equaled two-thirds that number. (LIT-011189.) Indeed, as of April 2008, the Service considered WDFW's position that the Kettle Range was occupied to be credible and—despite a lack of "thorough and comprehensive lynx surveys"—the "more appropriate conservative and defensible position." (FR-018828.)

However, by July 2014, WDFW had changed its position relative to lynx occupancy in the Kettle Range, and instead urged the Service to designate the area as critical habitat pursuant to the "essential to the conservation of the species" standard attendant unoccupied habitat. (PI-002683.) Echoing an opinion offered by numerous parties in response to the most recent proposed rule (*see, e.g.* FR-018769; FR-018777), WDFW noted that the Kettle Range may be important as a movement link between lynx populations in the Northern Rockies to the east and the North Cascades to the west. (PI-002683.) Just as others had noted though, WDFW indicated that the area's importance in terms of linkage was theoretical—no commenter appears to have provided scientific evidence of lynx utilizing the Kettle Range to travel from Montana and Idaho to western Washington. The Service stated as much in the September 2014 final rule, and indicated that absent any other feature elevating the importance of the Kettle

Range, it could not conclude "that this area is essential to the conservation and recovery of the" lynx. (FR-005255.) These were reasonable interpretations of the evidence before the agency, and consequently the Court will not second guess the Service's evaluation of the science. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014). The Court grants Defendants' motion for summary judgment with respect to the Kettle Range.

### C.    Montana and Idaho

Plaintiffs in CV 14–272–M–DLC contend that the Service erred by excluding the Beaverhead-Deerlodge, Bitterroot, Nez Perce, Clearwater, and Idaho Panhandle National Forests, as well as portions of the Lolo and Helena National Forests, from the September 2014 final rule[5]. They primarily allege that the Service failed to comply with the Court's remand instructions in *Lyder* by neglecting to consider whether the above lands contained the physical and biological features essential to lynx recovery. The Service counters that its analysis was reasonable in that prior to analyzing those features, the agency conducted a thorough occupancy analysis. Moreover, at least as to the Beaverhead-Deerlodge, Bitterroot, and Clearwater National Forests, the Service

---

[5]Plaintiffs's argument does not include any points specific to the Idaho Panhandle National Forest, nor did the Court address it in *Lyder*. Consequently, the Court will focus on the other enumerated National Forests, as it did in the previous order.

claims to have examined the physical and biological features along with occupancy. The Court agrees with Plaintiffs that Service largely failed to comply with *Lyder*, and will grant their motion for summary judgment on this issue.

As mentioned above, in *Lyder* the Court found that the Service improperly used the absence of evidence of reproduction as a proxy for determining that portions of Montana and Idaho did not contain the PCE. 728 F. Supp. 2d at 1134–35. That the question of whether the PCE was or was not present on the lands at issue indicates that the Court and the parties understood those lands to be occupied at the time of listing—otherwise, the question would be whether the lands themselves were essential for lynx conservation. On remand, the Court directed the Service to "consider the physical and biological features *of the occupied areas* to determine whether they should be designated as critical habitat under the ESA." *Id*. at 1135.

However, in the September 2014 final rule, the Service focused more intently on whether the forests were occupied in the first instance. As to the Beaverhead-Deerlodge, the Service cited numerous data suggesting a post-listing absence of lynx, and in a single line addressed the PCE by stating that "most of the Beaverhead-Deerlodge National Forest was and appeared to be dry lodgepole pine, which likely is not good lynx habitat." (FR-005276 (quotation marks

omitted).)  As to the Bitterroot, the Service again cited mostly occupancy-related data, and only addressed the PCE by citing a 2012 study that found only 16.1% of 223 forest vegetation plots "met minimum horizontal cover standards for snowshoe hare/lynx habitat."  (*Id*.)  As to the Clearwater, the Service cites two studies—one specific to forest carnivore presence, which speaks to occupancy, and another specific to hare habitat and density, which speaks to the PCE.  (FR-005277.)  The Service's analyses of the Nez Perce, Helena, and Lolo National Forests mention only lynx tracking data, and include no study-based examination of the PCE.  (FR-005276–77.)  Yet, with respect to each National Forest, the Service found "no scientific evidence that [the particular] area contains the physical and biological features essential to lynx in adequate quantity and spatial arrangement," and that therefore none contained the PCE.

The Service clearly failed to comply with the remand order with respect to the Nez Perce, Helena, and Lolo National Forests—the September 2014 final rule contains no specific analyses of the PCE in these forests, and instead exchanges occupancy for lack of reproductive data as an impermissible proxy for the presence of the PCE.  The Service approached compliance with the remand order with respect to the Beaverhead-Deerlodge and Bitterroot National Forests by considering forest types and horizontal cover, but ultimately failed to justify why

each forest was excluded in its entirety from the critical habitat designation. The Service specifically noted that most, but not all, of the Beaverhead-Deerlodge was dry lodgepole, and that a portion of the plots in the Bitterroot study *did* meet horizontal cover standards. Rather than designating those areas that apparently could serve as lynx habitat—the "but not all" on the Beaverhead-Deerlodge and the 16.1% of the Bitterroot—the Service simply resorted to the same extra-PCE "quantity and spatial arrangement" metric relied upon to exclude all of Colorado. As discussed in detail above, the Service may not qualify the PCE in this manner. Thus, only with respect to the Clearwater National Forest did the Service comply with the Court's order in *Lyder* and actually analyze the PCE, specifically the element of snowshoe hare habitat and density. Consequently, the Court will grant Plaintiffs' motion for summary judgment on this issue, and remand the September 2014 final rule to the Service to perform an analysis of the PCE—not through reproduction or occupancy-based proxies—in the Beaverhead-Deerlodge, Bitterroot, Nez Perce, Lolo and Helena National Forests.

### D.    Oregon

Plaintiffs in CV 14–270–M–DLC allege that the Service erred in excluding the state of Oregon from the September 2014 critical habitat designation, claiming that the Service ignored the best available science in doing so. However, Plaintiffs

recognize in their brief that "the existence of a self-sustaining [lynx] population is unlikely" in Oregon, and that lynx presence there is intermittent. (Doc. 32 at 31.) They nevertheless cite an unpublished Service white paper indicating that lynx were historically present on the east and west slopes of the Cascade Range in Washington and Oregon. (PI-007830 et seq.) While the paper stands for the propositions Plaintiffs raise, there is no information accompanying the document to indicate its author or date of publication. Moreover, the paper appears more a solicitation for comments regarding issues surrounding lynx in this part of the west than a definitive study. This is insufficient to overcome the Service's reasonable interpretation and application of what the Court agrees is the best available science regarding lynx presence in Oregon, including its determinations from previous Federal Register publications and the comments of United States Forest Service wildlife biologist Keith Aubry, who noted a total of twelve verified records of lynx occurring in Oregon between 1897 and 1993. (LIT-014469.) For these reasons, the Court will grant Defendants' motion for summary judgment with respect to the Service's exclusion of Oregon from the September 2014 final rule.

### E. Plaintiffs' remaining arguments

Fore the reasons articulated in the Court's order in *Lyder*, the Court rejects

Plaintiffs arguments in CV 14–272–M–DLC related to whether the Service erred by not designating unoccupied habitat that nevertheless could serve as lynx travel corridors and climate change refugia in the future. The Court agrees with Defendants that the purported distinctions between Plaintiffs's arguments as articulated in *Lyder* and those in the instant case are negligible, and therefore subject to the same analysis. *See* 728 F. Supp. 2d at 1138–40.

## CONCLUSION

When it published the September 2014 final rule designating lynx critical habitat in the United States, the Service erred by: (1) excluding the state of Colorado from the designation, based upon an improper application of the lynx PCE and ignoring the best available science; and (2) failing to comply with the Court's remand order in *Lyder* with respect to the Beaverhead-Deerlodge, Bitterroot, Nez Perce, Lolo and Helena National Forests. In all other respects, this most recent critical habitat designation is lawful and satisfies the Service's statutory mandate under the ESA. As the multi-year effort to protect the landscapes required by the lynx continues, the Court is confident that the final product will, as the ESA demands, "conserve to the extent practicable" the Canada lynx.

Accordingly, IT IS ORDERED that:

(1)     Plaintiffs' motion for summary judgment (Doc. 31) is GRANTED IN

PART.  The motion is GRANTED with respect to the Service's

failure to designate the state of Colorado as occupied lynx critical

habitat in the September 2014 final rule.  The motion is DENIED in

all other respects.

(2)     Plaintiffs' motion for summary judgment (Doc. 34) is GRANTED IN

PART.  The motion is GRANTED with respect to the Service's

failure to designate the state of Colorado as occupied lynx critical

habitat in the September 2014 final rule, and its failure to comply

with the Court's remand order in *Alliance for the Wild Rockies v.*

*Lyder*, 726 F. Supp. 2d 1126 (D. Mont. 2010) regarding the the

Beaverhead-Deerlodge, Bitterroot, Nez Perce, Lolo and Helena

National Forests of Montana and Idaho.  The motion is DENIED in

all other respects.

(3)     Defendants' motion for summary judgment (Doc. 42) is GRANTED

IN PART.  The motion is GRANTED with respect to the Service's

determinations in the September 2014 final rule regarding the Kettle

Range of northeastern Washington, the state of Oregon, unoccupied

habitat designations related to travel corridors and climate change,

and the lynx PCE.  The motion is DENIED in all other respects.

(4)     Defendants' motion to strike (Doc. 40) is GRANTED.

(5)     The September 2014 final rule, 79 Fed. Reg. 54,782 et seq., is hereby

REMANDED to the Service for further action consistent with this

order.  The final rule shall remain in effect until the Service issues a

new final rule on lynx critical habitat, at which time the September

2014 final rule will be superseded.

DATED this 7th day of September, 2016.

Dana L. Christensen, Chief District Judge
United States District Court